EXCLUSIVE RECORDING ARTIST AGREEMENT

between

SUNSHINE SOUND ENTERPRISES, INC.

and

RONALD SMITH

INDEX

to

EXCLUSIVE RECORDING ARTIST AGREEMENT

| Paragraph | | Page |
|---|---|---|
| 1. | Term | 1 |
| 2. | Recording Services | 1 |
| 3. | Recording Commitment | 1 |
| 4. | Recording Procedure | 2 |
| 5. | Recording Costs | 2 |
| 6. | Advances | 2 |
| 7. | Grant of Rights | 3 |
| 8. | Royalties | 3 |
| 9. | Miscellaneous Royalty Provisions | 5 |
| 10. | Royalty Accountings | 6 |
| 11. | Warranties, Representations, Restrictions and Indemnities | 8 |
| 12. | Definitions | 9 |
| 13. | Suspension and Termination | 11 |
| 14. | Assignment | 12 |
| 15. | Notices | 12 |
| 16. | Miscellaneous | 13 |
| 17. | Additional Provision — Merchandising Rights | 13 |
| 18. | Addition Provision — Publishing | 14 |
| 19. | Additional Provision — Group | 14 |
| | Exhibit "A" | Attached |

PATTON, KANNER, SEGAL, ZELLER, KING & MIDDELTHON, ATTORNEYS AT LAW, MIAMI, FLORIDA

AGREEMENT made this ___ day of June, 1978, by and between SUNSHINE SOUND ENTERPRISES, INC., a Florida corporation of Reda Redacted Redacted , Miami, Florida (herein called "Company") and RONALD SMITH of Redacted                    Redacted Miami, Florida (herein called "you" or "Artist");

W I T N E S S E T H:

In consideration of the mutual promises and covenants herein contained, the parties hereby agreed as follows:

1.   TERM

(a)  The term hereof (the "Term") shall consist of an initial period of one (1) year commencing on the date hereof (the "First Contract Year") plus the additional "Contract Years", if one or more of the options granted to Company below (unless otherwise extended or suspended as provided herein).

(b)  You hereby irrevocably grant to Company four (4) separate consecutive options to extend the Term for a "Second", "Third", "Fourth" and a "Fifth" Contract Year, respectively, such Contract Years to consist of one (1) year each. Each such option shall be deemed to be exercised by Company unless it shall give you written notice to the contrary at least ten (10) days prior to the date that the then current Contract Year would otherwise expire.

2.   RECORDING SERVICES

During the Term of this Agreement you shall render to Company exclusively your services as a recording artist for the purpose of making Master Recordings and as otherwise set forth herein.

3.   RECORDING COMMITMENT

(a)  During each Contract Year, you shall render your services to Company in accordance with the terms and conditions hereof and you shall record the minimum number of Sides (the "Minimum Recording Commitment") set forth in the following schedule:

| CONTRACT YEAR | MINIMUM RECORDING COMMITMENT |
|---|---|
| First | Not less than the equivalent |
| Second | of one (1) album. |
| Third | |
| Fourth | |
| Fifth | |

— 1 —

(b)   Company shall have the right to increase your recording commitment in respect of any Contract Year, and you shall render to Company, exclusively, your services as a recording artist in connection with such additional number of Sides in excess of the Minimum Recording Commitment as Company may request, from time to time.  However, you shall not be obligated to perform hereunder for in excess of the equivalent of three (3) Albums (in the aggregate) during each Contract Year.

4.   RECORDING PROCEDURE

(a)   In connection with Master Recordings to be made hereunder, the following matters shall be determined by Company:

(i)   Selection of the producer;

(ii)   Selection of material to be recorded (including the number of Compositions to be recorded); and

(iii)   Selection of dates of recording and studios where recording is to take place, including the cost of recording therein.  The scheduling and booking of all studio time will be done by Company.

(b)   Each Master Recording made hereunder shall be subject to Company's approval as to whether the same is satisfactory for the manufacture and sale of Phonograph Records.

5.   RECORDING COSTS

(a)   Company will pay all minimum union scale payments required to be made to you in connection with Master Recordings made hereunder, all costs of all nonroyalty instrumental, vocal and other personnel and all costs for arrangements and copying incurred by Company hereunder, and all other amounts which are required to be paid by Company pursuant to any applicable law or any collective bargaining agreement between Company and any union representing persons who render services in connection with Master Recordings made hereunder.

(b)   All amounts described in Paragraph 5(a) above plus all other amounts paid by Company representing expenses incurred in connection with the making of Master Recordings hereunder (including, without limitation, all studio and engineering charges) are herein sometimes called "Recording Costs" and shall constitute Advances.

6.   ADVANCES

All monies paid to you, or on your behalf, with refer-

- 2 -

ence to this Agreement, other than royalties paid pursuant to Paragraph 8 hereof, shall constitute Advances unless otherwise expressly agreed in writing by an authorized officer of Company.

7.   GRANT OF RIGHTS

(a)   All Master Recordings made hereunder from the inception of recording thereof, and Phonograph Records manufactured therefrom, together with the performances embodied thereon, shall be the sole property of Company, free from any claims whatsoever by you or any other Person; and Company shall have the exclusive right to copyright such Master Recordings in its name as the owner and author thereof and to secure any and all renewals and extensions of such copyright.   Solely for the purposes of any applicable copyright law, all Persons rendering services in connection with the recording of such Master Recordings shall be deemed "employees for hire" of Company.

(b)   Without limiting the generality of the foregoing, Company and any Person authorized by Company shall have the unlimited right, throughout the world, to manufacture Phonograph Records by any method now or hereafter known, derived from the Master Recordings made hereunder, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, or to refrain from such manufacture, sale and dealing.

(c)   Company and any Licensee of Company each shall have the right, and may grant to others the right, to reproduce, print, publish, or disseminate in any medium your name, portraits, pictures and likeness and biographical material concerning you, as news or information, or for the purposes of trade, or for advertising purposes; provided, however, that no direct endorsement by you of any product or service shall be used without your written consent.   During the Term of this Agreement, you shall not authorize any Party other than Company to use your name or likeness in connection with the advertising or sale of Phonograph Records.   As used in this Agreement, "your name" shall include any professional names or sobriquets.

8.   ROYALTIES

Conditioned upon your full and faithful performance of all the terms and conditions hereof, you will be paid royalties on Net Sales of Records as hereinafter set forth:

(a)   Company will pay you as a basic royalty, the percentage set forth in the following schedule, of the applicable Royalty Base Price in respect of ninety (90%) percent of Net Sales of Phonograph Records in disc form, consisting entirely of Master Recordings performed by you and recorded hereunder and

-- 3 --

sold by Company or its Licensees through normal retail channels for distribution in the United States of America.

| CONTRACT YEAR | BASIC ROYALTY RATE |
|---|---|
| First | 5% |
| Second | 5% |
| Third | 6% |
| Fourth | 6% |
| Fifth | 7% |

(b)   In respect of Phonograph Records sold in the form of pre-recorded tape, the royalty payable to you therefor shall be one-half (1/2) of the applicable royalty rate which would have been payable to you if such Records were sold in disc form, and such royalties shall at all times be computed on the basis of ninety (90%) percent of Net Sales of such Records.

(c)   In respect of Phonograph Records sold to consumers through any mail order or record club operation (the "Club Opera-tion"), the royalty rate shall be one-half (1/2) of the otherwise applicable royalty rate (but in no event shall you be entitled to receive in excess of fifty (50%) percent of Company's net royalty receipts from such Club Operation after deduction of all royal-ties payable to the producers of such Master Recordings and all AFM and other applicable third party payments), and such royal-ties shall at all times be computed on the basis of eighty-five (85%) percent of Net Sales of such Records.   Notwithstanding the foregoing, no royalty shall be payable to you with respect to (i) Phonorgraph Records received by members of any such Club Opera-tion in an introductory offer in connection with joining it or upon recommedning that another join it or as a result of the purchase of a required number of Records, including, without limitation, Records distributed as "bonus" or "free" Records, or (ii) Phonograph Records for which such Club Operation is not paid.

(d)   In respect of Master Recordings leased by Company to others for the distribution of Phonograph Records through broadcast or other advertisements utilizing key-outlet distri-butors, the royalty payable to you shall be twenty-five (25%) percent of the net royalties received by Company from such key-outlet distributors after deduction of all royalties payable to the producers of such Master Recordings and all AFM and other applicable third party payments.

(e)   In respect of Phonograph Records sold to educa-tional institutions or libraries or to armed forces post ex-changes, the royalty shall be one-half (1/2) of the otherwise applicable royalty rate, and such royalties shall at all times be

- 4 -

computed on the basis of ninety (90%) percent of Net Sales of such Records.

(f)  With respect to Phonograph Records bearing a special label or a suggested retail list price which is at least $3.00 less than the suggested retail list price used for the top line Phonograph Records released by Coompany or by its Licensees in any territory, the royalty rate payable to you in respect of such Phonograph Records shall be one-half (1/2) of the otherwise applicable royalty rate, and such royalty shall at all times be computed on the basis of ninety (90%) percent of Net Sales of such Records.

(g)  In respect of Phonograph Records sold by Company or its Licensees for distribution outside of the United States of America, or licensed or otherwise furnished by Company or its Licensees to others for its manufacture and distribution outside of the United States of America, and royalty rate payable to you therefor shall be one-half (1/2) of the applicable royalty rate which would have been payable to you therefor if such Records had been sold for distribution in the United States of America; and such royalties shall at all times be computed on the basis of ninety (90%) percent of Net Sales of such Records.

9.   MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Paragraph 8 hereof:

(a)  (i)  With respect to Phonograph Records embodying Master Recordings made hereunder, together with other master recordings, the royalty rate payable to you shall be computed by multiplying the royalty rate otherwise applicable by a fraction, the numerator of which is the number of Sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of Sides contained on such Record; and

(ii)  With respect to Phonograph Records embodying Master Recordings made hereunder which embody your performances, together with the performances of another artist(s) to whom Company is obligated to pay royalties in respect of the sale of Phonograph Records derived from such Master Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on such Master Recording.

(b)  (i)  No royalties shall be payable to you with respect to Phonograph Records sold by Company or its Licensees until payment for such Records has been received by Company, or with respect to Phonograph Records sold as cut-outs after the listing of such Records has been deleted from the catalog of Company or the particular Licensee, or with respect to Phonograph Records sold for scrap at a salvage or close-out price or for less than fifty (50%) percent of Company's or its Licensee's regular wholesale price for such Records, or with respect to Phonograph Records distributed for promotional purposes or Phonograph Records distributed to radio stations or for use on transportation carriers and facilities to promote or stimulate the sale of Phonograph Records, or with respect to Phonograph Records sold or distributed as "free" or "no-charge" or "bonus" Records (whether or not intended for resale); and

(ii)  Notwithstanding anything to the contrary contained in Paragraph 9(b)(i) above, in respect of the sale by Company to its dealers or distributors of Phonograph Records subject to a discount or merchandising plan, the number of Records deemed to have been sold shall be determined by reducing the number of Records shipped by the percentage of discount granted, and if a discount is granted in the form of "free" or "no-charge" Records, such "free" or "no-charge" Records shall not be deemed included in the number of Records sold.  However such discounts (or "free" or "no-charge" Records) shall not exceed twenty (20%) percent of LP Records shipped, computed on a cumulative basis, and thirty (30%) percent of Single Records shipped, computed on a cumulative basis.

(c)  No royalty shall be payable to you unless and until Company has recouped all Advances and Recording Costs in connection with the Master Recordings made hereunder from the royalties payable to you in respect of Net Sales of Phonograph Records embodying such Master Recordings, and after such recoupment, royalties shall be paid to you only on those Records sold by Company or its Licensees after such recoupment.

(d)  Company shall have the right to withhold a portion of your royalties as a reserve for returns and/or credits, which reserve shall be determined by Company in its reasonable judgment.

(e)  The royalty rate applicable to a given Master Recording shall be the royalty rate specified herein for the Contract Year in which such Master Recording was recorded.

10.  ROYALTY ACCOUNTINGS

(a)  Company shall compute royalties payable to you

- 6 -

hereunder as of _JUNE 30_ and _DECEMBER 31_ for each preceding six (6) month period during which Records as to which royalties are payable hereunder are sold, and will render a statement and pay such royalties, less any unrecouped Advances and any other permissible offsets prior to each succeeding _NOVEMBER 30_ and _MAY 31_, respectively. Company may deduct from any royalty or other payment under this Agreement any amount you may owe Company under this Agreement or any other agreement between you and Company.

(b)   Royalties for Records sold for distribution outside of the United States of America (herein "foreign sales") shall be computed in the national currency in which Company is paid by its Licensees and shall be paid to you at the same rate of exchange at which Company is paid.  For accounting purposes, foreign sales shall be deemed to occur in the same semi-annual accounting periods in which Company's Licensees account to Company therefor.  If Company is unable, for reasons beyond its control, to receive payment for such sales in United States dollars in the United States of America, royalties therefor shall not be credited to your account during the continuance of such inability; if any accounting rendered to you hereunder during the continuance of such inability requires the payment of royalties to you, Company will, at your request and if Company is able to do so, deposit such royalties to your credit in such foreign currency in a foreign depository at your expense.

(c)   At any time within one (1) year after any royalty statement is rendered to you hereunder, you shall have the right to give Company written notice of your intention to examine Company's books and records with respect to such statement.  Such examination shall be commenced within three (3) months after the date of such notice, at your sole cost and expense, by any certified public accountant or attorney designated by you, provided he is not then engaged in an outstanding examination of Company's books and records on behalf of a person other than you.  Such examination shall be made during Company's usual business hours at the place where Company maintains the books and records which relate to you and which are necessary to verify the accuracy of the statement or statements specified in your notice to Company and your examination shall be limited to the foregoing.  Your right to inspect Company's books and records shall be only as set forth in this Paragraph 10(c) and Company shall have no obligation to produce such books and records more than once with respect to each statement rendered to you.

(d)   Unless notice shall have been given to Company as provided in Paragraph 10(c) hereof, each royalty statement rendered to you shall be final, conclusive and binding on your and shall constitute an account stated.  You shall, and hereby

- 7 -

agree to, be foreclosed from maintaining any action, claim or proceeding against Company in any forum or tribunal with respect to any statement or accounting rendered hereunder unless such action, claim or proceeding is commenced against Company in a court of competent jurisdiction within two (2) years after the due date of such statement or accounting.

(e)  You acknowledge that Company's books and records contain confidential trade information.  Neither you nor your representative will communicate to others or use on behalf of any other person any facts or information obtained as a result of such examination of Company's books and records.

11.  WARRANTIES, REPRESENTATIONS, RESTRICTIONS AND INDEMNITIES

(a)  You warrant and represent that:

(i)  You have the right and power to enter into and fully perform this Agreement;

(ii)  Company shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by Company pursuant to this Agreement, except as specifically provided in this Agreement;

(iii)  You are, or will become, and will remain (to the extent necessary to enable the performance of this Agreement) a member in good standing of all labor unions or guilds, which may be lawfully required for the performance of your services hereunder; and

(iv)  Neither the "Materials" nor any use of the Materials by Company will violate or infringe upon the rights of any Person, "Materials" as used in this subparagraph means any muscial, artistic and literary materials, ideas and other intellectual properties, furnished by you and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

(b)  (i)  During the Term of this Agreement, you will not enter into any agreement which would interfere with the full and prompt performance of your obligations hereunder, and you will not perform or render any services for the purpose of making Phonograph Records or Master Recordings for any person other than Company.  After the expiration of the Term of this Agreement, for any reason whatsoever, you will not perform any Composition which shall have been recorded hereunder for any person other than Com-

- 8 -

pany for the purpose of making Phonograph Records or Master Recordings prior to the date five (5) years subsequent to the expiration date of the Term of this Agreement.

(ii)  You will not at any time record, manufacture, distribute or sell, or authorize or knowingly permit your performances to be recorded by any party for any purpose without an express written agreement prohibiting the use of such Recording on Phonograph Records in violation of the foregoing restrictions.

(c)  In the event that you shall become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing recording restrictions, you shall notify Company thereof and shall cooperate with Company in the event that Company commences any action or proceeding against such third party.

(d)  Your services hereunder are unique and extra ordinary and the loss thereof cannot be adequately compensated in damages, and, in view of the preceding, Company shall be entitled, and is hereby granted the right, to injunctive relief to enforce the provisions of this Agreement.

(e)  You will at all times indemnify and hold harmless Company and any Licensee of Company from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty, representation or agreement made by you herein.  You will reimburse Company and/or its Licensees on demand for any payment made at any time after the date hereof in respect of any liability or claim in respect of which Company or its Licensees are entitled to be indemnified.

12.  DEFINITIONS

As used in this Agreement, the following terms shall have the meanings set forth below:

(a)  "Master Recording" - each and every recording of sound, whether or not coupled with a visual image, by any method and on any other substance or material, whether now or hereafter known, which is used or useful in the recording, production and/or manufacture of Phonograph Records.

(b)  "Person" and "Party" - any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

— 9 —

(c)  "Records", "Phonograph Records" and "Recordings" –
all forms of reproductions, now or hereafter known, manufactured
or distributed primarily for home use, school use, juke box use,
or use in means of transportation, embodying (i) sound alone; or
(ii) sound coupled with visual images, e.g. "sight and sound"
devices.

(d)  "Retail Selling Price" – with respect to Records
sold for distribution in the United States of America, the sug-
gested retail selling price or suggested retail list price, as
the case may be, except that the suggested retail selling price
for 12-inch 45 rpm single records shall be deemed to be the
suggested retail selling price of a 7-inch 45 rpm single record;
and with respect to Records sold for distribution outside of the
United States of America, the suggested retail list price of such
Records, in, at Company's election, the country of manufacture,
the United States of America or the country of sale.

(e)  "Royalty Base Price" – the applicable suggested
Retail Selling Price of Phonograph Records less all taxes and
less the applicable Container Charge.

(f)  "Container Charge" – (i) with respect to disc
Phonograph Records, twelve (12%) percent of the applicable Retail
Selling Price of such Phonograph Records; and (ii) with respect
to Phonograph Records in non-disc configurations, twenty-four
(24%) percent of the applicable Retail Selling Price of such
Phonograph Records; and (iii) with respect to 7-inch "single"
Phonograph Records contained in non-standard color sleeves, ten
(10%) percent of the applicable Retail Selling Price of such
Phonograph Records.

(g)  "Net Sales" – gross sales less returns and credits
of any nature.

(h)  "Advance" – amount recoupable by Company from
royalties to be paid to you or on your behalf pursuant to this or
any other agreement.

(i)  "Composition" – a single musical composition,
irrespective of length, including all spoken words and bridging
passages and including a medley.

(j)  "Controlled Composition" – a composition written,
owned or controlled by you and/or any Person in whcih you have a
direct or indirect interest.

(k)  "Album" – one (1) twelve-inch, 33-1/3 rpm Record,
or the equivalent thereof, embodying thereon not less than eight
(8) Sides nor more than eleven (11) Sides, whether or not re-

– 10 –

leased, which are recorded in connection with a specific album project.

(1) "Side" - a Recording of sufficient playing time to constitute one (1) Side of a 45 rpm Record, but not less than two and one-quarter (2-1/4) minutes of continuous sound.

(m) "Sales Through Normal Retail Channels in the United States of America" - sales other than as described in subparagraphs 8(c), (d), (e), (f) and (g) hereof.

(n) "Licensees" - includes, without limitation, subsidiaries, wholly or partly owned, and other divisions of Company and any of Company's licensees, i.e. persons dealing with Company's product pursuant to rights granted by Company.

13.   SUSPENSION AND TERMINATION

(a) If at any time you fail (except solely for Company's refusal without cause to allow you to perform) to fulfill your recording commitment herein within the times set forth herein, then, without limiting Company's rights, Company shall have the option, exercisable by notice to you, to extent the expiration date of the then current period of the Term hereof, and/or to suspend Company's obligation to you hereunder (including, without limitation, Company's obligations to make payments to you hereunder) for the period of the default plus such additional time as is necessary so that Company shall have no less than sixty (60) days after completion of your recording commitment within which to exercise its option, if any, for the next following Contract Year.

(b) If in respect of any Contract Year of the Term of this Agreement, Company fails, without cause, to allow you to fulfill your Minimum Recording Commitment and it, within thirty (30) days after the expiration date of such Contrct Year you shall notify Company of your desire to permit you to fulfill said Minimum Recording Commitment, then Company shall permit you to fulfill said Minimum Recording Commitment by notice to you to such effect within sixty (60) days of Company's recipt of your notice.  Should Company fail to give such notice, you shall have the option within thirty (30) days after the expiration of said sixty (60) day period to give notice that you wish to terminate the Term of this Agreement.  Upon receipt by Company of such notice, the Term of this Agreement shall terminate and all parties will be deemed to have fulfilled all of their obligations hereunder except those obigations which survive the expiration of the Term (e.g. warranties, re-recording restrictions and obligation to pay royalties).  In the event you fail to give Company either notice within the period specified therefor, Company shall

- 11 -

be under no obligation to you for failing to permit you to fulfill such Minimum Recording Commitment.

(c)  If, because of Act of God, inevitable accident, fire, lockout, strike or other labor dispute, riot or civil commotion, act of public enemy, enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign), failure of technical facilities, illness or incapacity of any performer or producer, or other cause of a similar or different nature not reasonably within Compay's control, Company is materially hampered in the recording, manufacture, distribution or sale of Records, or Company's normal business operations become commercially impractical, then, without limiting Company's rights, Company shall have the option by giving you notice to suspend the Term of this Agreement for the duration of any such contingency plus such additional time as is necessary so that Company shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its option, if any, for the next following option period.  Any such extension of the then current Contract Year due to any cause set forth in this Paragraph 13(c) which involves only Company shall be limited to a period of six (6) months.

14.  ASSIGNMENT

Company may assign this Agreement or its rights hereunder, in whole or in part, to any third party or to its subsidiary, affiliated or controlling corporation or to any Person owning or acquiring a substantial portion of the stock or assets of Company.  Company may also assign its rights hereunder to any of its Licensees to the extent necessary or advisable in Company's sole discretion to implement the license granted.  You may not assign this Agreement or any of your rights hereunder.

15.  NOTICES

Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by registered or certified mail or telegraph (pre-paid), at the respective addresses hereinabove set forth, or such other address or addresses as may be designated by either Party.  Such notices shall be deemed given when mailed or delivered to a telegraph office, except that notice of change of address shall be effective only from the date of its receipt.

A copy of all notices given by you to Company must be sent to Wm. Royall Middlethon, Jr., Esq., Patton, Kanner, Segal, Zeller, King & Middlethon, Suite 300, 150 Southeast Second Avenue, Miami, Florida 33131

- 12 -

16.   MISCELLANEOUS

(a)   This Agreement contains the entire understanding of the Parties hereto relating to the subject matter hereof and cannot be changed or terminated except by an instrument signed by an officer of Company.  A waiver by either Party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.  All remedies, rights, undertakings, obligations, and agreements contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, obligation or agreement of either Party.

(b)   Those provisions of any applicable collective bargaining agreement between Company and any labor organization which are required, by the terms of such agreement, to be included in this Agreement shall be deemed incorporated herein.

(d)   This Agreement has been entered into in the State of Florida, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Florida applicable to contracts entered into and performed entirely within the State of Florida, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance, or breach of this Agreement. Any process in any action or proceeding commenced in the courts of the State of Florida or elsewhere arising out of any such claim, dispute or disagreement, may, among other methods, be served upon you by delivering or mailing the same, via registered or certified mail, addressed to you at the address first above written or such other address as you may designate pursuant to Paragraph 15 hereof.  Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida or the jurisdiction in which such action or proceeding may be commenced.

(e)   If any part of this Agreement shall be determined to be invalid or unenforceable by a court of competent jurisdiction or by any other legally constituted body having the jurisiton to make such determination, the remainder of this Agreement shall remain in full force and effect.

17.   ADDITIONAL PROVISION - MERCHANDISING

You hereby grant to Company and its Licensees the exclusive right, throughout the world, to use and authorize the use of your name, portraits, pictures, likenesses and biographical material either alone or in conjunction with other elements, in connection with the sale, lease, licensing or other disposition

- 13 -

of merchandising rights. For the rights granted by you to Company in this paragraph, Company shall pay to you fifty (50%) percent of the net royalties received by Company from the exploitation of such rights by Company after deducting all costs and third party payments relating thereto; and such royalty shall be accounted to you in the manner otherwise provided herein.

18. ADDITIONAL PROVISION - PUBLISHING

You hereby irrevocably and absolutely assign, convey and set over to Company the entire right, tile and interest (including the worldwide copyright and all extensions and renewals of such copy rights) in and to each and every Controlled Composition that is recorded hereunder. You agree to execute and deliver to Company (or Company's affiliated music publishing company or to any other publishing company designated by Company), a separate Songwriter's Agreement in respect of each Controlled Composition subject to the provisions of this paragraph, in the form of Exhibit "A" attached hereto and made a part hereof by this reference. All the terms and conditions of said Songwriter's Agreement shall govern the respective rights and obligations of the parties with respect to such Controlled Compositions. If you shall fail to promptly execute such Songwriter's Agreement, you hereby irrevocably grant to Company a power of attorney to execute said agreement in your name.

19. ADDITIONAL PROVISION - GROUP

The terms of this Paragraph 19 shall be effective in the event that you are comprised of more than one (1) individual:

(a) Your obligation under the terms of this Agreement are joint and several and all references to you shall include all members of the group jointly and each member of the group individually, unless otherwise specifically provided herein.

(b) You represent and warrant that you are the sole owner of any and every group name now used or hereafter adopted by you insofar as rights of ownership can be acquired in a group name; that no other person or persons have the right to use said group name or to authorize or license its use in connection with Records; tht you have the full right and authority to grant to Company all of the rights to use said group name as is contemplated in this Agreement.

(c) Any breach of this Agreement by any of the persons comprising you shall be deemed to be a breach by all of the persons comprising you.

- 14 -

PATTON, KANNER, SEGAL, ZELLER, KING & MIDDELTHON, ATTORNEYS AT LAW, MIAMI, FLORIDA

(d) If any member comprising you shall cease to perform as a member of the group, the following provisions shall apply:

(i) You shall promptly notify Company thereof and such leaving member shall be replaced by a new member, and such new member shall be subject to Company's approval. Such approved new member shall thereafter be deemed substituted as a party to this Agreement in the place of such leaving member and shall automatically be bound by all the terms and conditions of this Agreement. Upon Company's request, you will cause any such new member to execute and deliver to Company such documents as Company, in its judgment, may deem necessary or advisable to effectuate the foregoing sentence. Thereafter, the leaving member shall no longer be required to render his recording services hereunder as a member of the group, but you (and such leaving member individually) shall continue to be bound by the other provisions of this Agreement, including, without limitation, subparagraph 19(d)(iv);

(ii) Notwithstanding anything to the contrary contained herein, Company shall have the right to terminate the Term of this Agreement with respect to the remaining members of you by written notice given to you by written notice given to you at any time prior to the expiration of ninety (90) days after Company's receipt of your said notice to Company. In the event of such termination, all of the members comprising you shall be deemed leaving members as of the date of such termination notice, and subparagraph 19(d)(iv) hereof shall be applicable to all of you, collectively or individually as Company shall elect;

(iii) Each leaving member hereby relinquishes all of his rights in the group name to the remaining members of the group; and

(iv) Company shall have, and you hereby grant to Company, an option to engage the exclusive services of such leaving member as a recording artist ("Leaving Member Option"). Such Leaving Member Option may be exercised by Company by notice to such leaving member at any time prior to the expiration of ninety (90) days after the date of (A) Company's receipt of your notice provided for in sub-paragraph 19(d)(i), or (B) Company's termination notice pursuant to subparagraph 19(d)(ii), as the case may be. If Company exercises such Leaving Member Option, the leaving member concerned shall be deemed to have executed Company's then current standard form of exclusive recording artist agreement on all the same terms and conditions as are contained in Paragraphs 1 - 18 of this Agreement, except that the term of the new exclusive recording artist agreement shall commence on the date Company exercises its Leaving Member Option.

— 15 —

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

SUNSHINE SOUND ENTERPRISES, INC.

By _____

RONALD SMITH

Attest: _____

Redacted

Address

Soc. Sec. # Redacted 1820

(Corporate Seal)

— 16 —

## STANDARD SONGWRITER'S CONTRACT

AGREEMENT entered into this _____ day of _____, 197_, by and between HARRICK MUSIC, INC. (hereinafter referred to as "PUBLISHER") and RONALD L. SMITH or his publishing company designee (hereinafter collectively referred to as "COMPOSER").

1.   COMPOSER hereby sells, assigns and delivers to PUBLISHER, its successors and assigns, the original musical composition written and composed by COMPOSER, presently entitled _____ (the "Composition"), including the title, words and music thereof, all worldwide rights therein, all copyrights therein and thereto, all registrations with respect thereto, and the exclusive right to secure copyrights and any extensions and renewals of copyrights in the same and in any arrangements and adaptations thereof, all throughout the world, and any and all other rights, claims and demands that COMPOSER now has or to which he might be entitled or that he hereafter could or might secure throughout the world with respect thereto if these presents had not been made, and to have and to hold the same absolutely and forever unto PUBLISHER, its successors and assigns.

2.   COMPOSER hereby warrants and represents that the Composition is an original work, that neither the Composition nor any part thereof infringes upon the title, literary or musical property or copyright of or in any other work nor the statutory, common law or other rights (including rights of privacy) of any person, firm or corporation, that he is the sole writer and composer and the sole owner of the Composition and of all the rights therein, that he has not sold, assigned, transferred, hypothecated or mortgaged any right, title or interest in or to the Composition or any part thereof or any of the rights herein conveyed, that he has not made or entered into any contract with any other person, firm or corporation affecting the Composition or any right, title or interest therein or in the copyright thereof, that no person, firm or corporation other than COMPOSER has or has had claims or has claimed any right, title or interest in or to the Composition or any part thereof, any use thereof or any

EXHIBIT "A"

copyright therein, that the Composition has never been published, and that COMPOSER has full right, power and authority to make this present instrument of sale and transfer.

3.  In consideration of this contract and of the rights and interests hereby conveyed and granted, PUBLISHER agrees to pay to COMPOSER the following royalties in respect of the Composition:

(a)  Five cents ($.05) per copy for each piano copy of the Composition and for each dance orchestration of the Composition printed, published and sold in the United States and Canada by PUBLISHER or its licensees, for which payment has been received by PUBLISHER, after deduction of returns.

(b)  Ten percent (10%) of the wholesale selling price upon each printed copy of each other arrangement and edition of the Composition, printed, published and sold in the United States and Canada by PUBLISHER (or its licensees), for which payment has been received, after deduction of returns, except that in the event the Composition shall be used or caused to be used, in whole or in part, in conjunction with one or more other compositions in a folio, album or other publication, COMPOSER shall be entitled to receive that proportion of said royalty which the Composition shall bear to the total number of compositions contained in such folio, album or other publication.

(c)  Fifty percent (50%) of any and all net sums actually received (less any costs for collection) by PUBLISHER in the United States from the exploitation in the United States and Canada by licensees of PUBLISHER of mechanical rights, electrical transcription and reproducing rights, motion picture and television synchronization rights, printing rights (except as provided in (a) and (b) above), and all other rights (excepting public performing rights) in the Composition, whether or not such licensees are affiliated with, owned in whole or in part by, or controlled by PUBLISHER.

(d)  COMPOSER shall receive his public performance royalties throughout the world directly from his

2

own affiliated performing rights society and shall
have no claim whatsoever against PUBLISHER for any
royalties received by PUBLISHER from any performing
right society which makes payment directly (or indi-
rectly other than through PUBLISHER) to writers,
authors and composers.

(e)  Fifty percent (50%) of any and all net sums,
after deduction of foreign taxes, actually received
(less any costs for collection) by PUBLISHER in the
United States from sales, licenses and other uses of
the Composition in countries outside of the United
States and Canada [other than public performance
royalties as hereinabove mentioned in subparagraph
3(d)] from collection agents, licensees, subpublishers
or others, whether or not same are affiliated with,
owned in whole or in part by, or controlled by PUBLISHER.

(f)  PUBLISHER shall not be required to pay any
royalties on professional or complimentary printed
copies of the Composition or copies of mechanical
derivatives of the Composition which are distributed
gratuitously to performing artists, orchestra leaders
and disc jockeys or for advertising, promotional or
exploitation purposes.  Furthermore, no royalties
shall be payable to COMPOSER on consigned copies of
the Composition unless paid for, and not until such
time as an accounting therefor can properly be made.

(g)  If the Composition does not now have lyrics,
and lyrics shall hereafter be added by PUBLISHER, the
above royalties shall be divided equally between COM-
POSER on the one hand and the writer or writers of
the lyrics on the other hand.

(h)  Except as herein expressly provided no
other royalties or moneys shall be paid to COMPOSER.
In no event shall COMPOSER be entitled to share in
any advance payments, guarantee payments or minimum
royalty payments which PUBLISHER may receive in con-
nection with any subpublishing agreement, collection
agreement, licensing agreement or other agreement
covering the Composition.

4.  Within ninety (90) days after the last days
of June and December in each year, PUBLISHER will prepare

3

and furnish semiannual statements to COMPOSER hereunder, and each such statement shall be accompanied by payment of any and all sums shown to be due thereby, after deduction of any and all advances.  PUBLISHER shall have the right to retain as a reserve against returns such portion of payable royalties as shall be necessary in its best business judgment.  COMPOSER shall notify PUBLISHER in writing of any specific objection to such statements no later than one (1) year after the receipt thereof by COMPOSER. Any and all objections, questions or disputes concerning any such statement shall be waived by COMPOSER unless such written objection is received by PUBLISHER within such one (1) year period.  COMPOSER or a certified public accountant in his behalf may, at COMPOSER's expense, not more than once during each one (1) year period, examine PUBLISHER's books insofar as same concern COMPOSER, during PUBLISHER's usual business hours and upon reasonable written notice, for the purpose of verifying the accuracy of any statements rendered to COMPOSER hereunder.  PUBLISHER's books relating to activities during any accounting period may only be examined as aforesaid during the one (1) year period following receipt by COMPOSER of the statement for said accounting period.

        5.    COMPOSER hereby grants to PUBLISHER the perpetual right to use and publish and to permit others to use and publish COMPOSER's name (including any professional name heretofore or hereafter adopted by COMPOSER), likeness and biographical material, or any reproduction or simulation thereof and the title of the Composition in connection with the printing, sale, advertising, distribution and exploitation of music, folios, recordings, performances, player rolls and otherwise concerning the Composition, and for any other purpose related to the business of PUBLISHER, its associates, affiliates and subsidiaries, or to refrain therefrom.

        6.    COMPOSER hereby acknowledges that PUBLISHER has the right hereunder, in its sole discretion, to substitute a new title or titles for the Composition, to make changes, arrangements, adaptations, translations, dramatizations and transpositions of the Composition, in whole or in part, and in connection with any other musical, literary or dramatic material, and to add new lyrics to the music of the Composition or new music to the lyrics of the Composition.  COMPOSER hereby waives any and all claims which

4

he has or may have against PUBLISHER, its associates, affiliates and subsidiaries by reason of the fact that the title of the Composition may be the same as or similar to that of any other musical compositions heretofore or hereafter acquired by PUBLISHER.

7.   COMPOSER hereby authorizes and empowers PUBLISHER as COMPOSER's true and lawful attorney to renew, pursuant to law, for and in the name of COMPOSER, if living, the copyright of the Composition, and to execute and deliver in the name of COMPOSER a formal assignment of each renewal copyright to PUBLISHER, for its own use and benefit, subject to the payment of the same royalties as hereinbefore provided.

8.   COMPOSER shall not transfer nor assign this contract nor any interest therein nor any sums that may be or become due hereunder without the prior written consent of PUBLISHER, and no purported assignment or transfer in violation of this restriction shall be valid to pass any interest to the assignee or transferee.

9.   PUBLISHER may take such action as it deems necessary, either in COMPOSER's name or in its own name, against any person to protect the rights and interest acquired by PUBLISHER hereunder.  COMPOSER will, at PUBLISHER's request, cooperate fully with PUBLISHER in any controversy which may arise or litigation which may be brought concerning PUBLISHER's rights and interests acquired hereunder.  PUBLISHER shall have the right, in its absolute discretion, to employ attorneys and to institute or defend any action or proceeding and to take any other proper steps to protect the right, title and interest of PUBLISHER in and to the Composition and every portion thereof and in that connection, to settle, compromise or in any other manner dispose of any matter, claim, action or proceeding and to satisfy any judgment that may be rendered, in any manner as PUBLISHER in its sole discretion may determine. Any legal action brought by PUBLISHER against any alleged infringer of the Composition shall be initiated and prosecuted by PUBLISHER, and if there is any recovery made by PUBLISHER as a result therof, after deduction of the expense of litigation, including but not limited to attorneys' fees and court costs, a sum equal to fifty percent (50%) of such net proceeds shall be paid to COMPOSER.  If a claim is presented against PUBLISHER with respect to the Composition, and

5

because thereof PUBLISHER is jeopardized, PUBLISHER shall have the right thereafter, until said claim has been fully adjudicated or settled, to withhold any and all royalties that may be or become due with respect to the Composition pending the final adjudication or settlement of such claim. PUBLISHER, in addition, may withhold other royalties to be earned pursuant to this contract or any other agreement between COMPOSER and PUBLISHER, sufficient, in the opinion of PUBLISHER, to reimburse PUBLISHER for any contemplated damages, including court costs and attorneys' fees and costs resulting therefrom. PUBLISHER shall advance the costs of litigation, if any, including court costs and attorneys' fees together with any damages which may be paid as a result of the settlement or adjudication of a claim in connection with the Composition. COMPOSER hereby agrees to indemnify and hold PUBLISHER harmless from and against any and all costs and damages incurred by PUBLISHER in the settlement or adjudication of any claim in connection with the Composition. In addition to all of PUBLISHER's other rights and remedies in connection with such indemnity, all such costs and damages shall be deemed an advance against any royalties payable to COMPOSER under this contract or any other agreement between COMPOSER and PUBLISHER. Upon the final adjudication or settlement of each and every claim hereunder, all moneys withheld shall then be disbursed in accordance with the rights of the parties as provided hereinabove.

10. The term "COMPOSER" shall be understood to include all the writers and composers of the Composition. If there be more than one, the covenants herein contained shall be deemed to be both joint and several on the part of the writers and composers and the royalties hereinabove specified to be paid to COMPOSER shall, unless a different division of royalties be specified, be due to all the writers and composers collectively, to be paid by PUBLISHER in equal shares to each.

11. PUBLISHER shall have the right to assign this agreement and any of its rights hereunder to and delegate any of its obligations hereunder, in whole or in part, to any person, firm or corporation. Without limiting the generality of the foregoing, PUBLISHER shall have the right to enter into subpublishing, collection, print or other agreements with respect to the Composition with any person, firm or corporation for any one or more countries of the world.

6

12.   This contract contains the entire understanding between the parties, and all of its terms, conditions and covenants shall be binding upon and shall inure to the benefit of the respective parties and their heirs, successors and assigns.  No modification or waiver hereunder shall be valid unless the same is in writing and is signed by the party sought to be bound.

13.   This contract shall be deemed to have been made in the State of Florida and its validity, construction and effect shall be governed by and construed under the laws and judicial decisions of the State of Florida applicable to agreements wholly performed therein.

14.   All notices, statements and payments required or desired to be given hereunder shall be given by addressing same to the addresses of the respective parties hereinbelow set forth, or to such other address as either party may hereafter designate, by written notice, to the other party. Notices shall be in writing and shall be delivered either personally (to an officer if the address is a corporation), by the United States mails, certified or registered, postage prepaid, or by cable or telegraph, charges prepaid.  Each notice shall be deemed served when delivered personally, or when deposited in the United States mail or in a telegraph or cable office.

15.   The use of the singular in this agreement shall apply to and mean the plural where appropriate.


IN WITNESS WHEREOF, the parties hereto have executed this contract the date hereinabove set forth.

HARRICK MUSIC, INC.


By_____

                                    RONALD L. SMITH


Address: Redacted
         Miami, Florida 33166

Address: Redacted
         Coral City, FLA.